No. 24-10784-A

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

Joseph Mercola,

*Plaintiff-Appellant*

v.

The New York Times Company,

*Defendant-Appellee*

Appeal from the United States District Court
for the Middle District of Florida

No. 2:23-cv-00545-SPC-KCD

---

## APPELLANT'S OPENING BRIEF

---

Eric P. Early
Jeremy Gray
Early Sullivan Wright
Gizer & McRae LLP
6420 Wilshire Blvd., 17th Floor,
Los Angeles, CA 90048
(323) 301-4660

Carol A. Thompson
Federal Practice Group
801 17th St. N.W., Suite 250
Washington, D.C. 20006
(202) 826-4360

*Counsel for Plaintiff-Appellant*

**Certificate of Interested Persons and
Corporate Disclosure Statement**

The New York Times Company (NYSE: NYT)

Mercola, Joseph

Chappell, Sheri P., U.S. District Judge

Dudek, Kyle, U.S. Magistrate Judge

Ballard Spahr LLP

Tobin, Charles D.

Mishkin, Maxwell S.

The Bonderud Law Firm, P.A.

Bonderud, Andrew M.

Federal Practice Group

Thompson, Carol A.

Early Sullivan Wright Gizer & McRae LLP

Early, Eric P.

Gray, Jeremy

**Statement Regarding Oral Argument**

Plaintiff-Appellant respectfully requests an opportunity to present an oral argument on the issues in this appeal.

# TABLE OF CONTENTS

Jurisdictional Statement ...................................................................................1

Statement of the Issues...................................................................................2

Statement of the Case.....................................................................................2

Standard of Review .........................................................................................5

Summary of Argument.....................................................................................6

Argument.........................................................................................................9

  I.    Statement One is a Statement of Fact. The "Scientific Debate" Opinion
Defense is Not Applicable to This Case. ...........................................................9

    A.   Context is Key in Determining Whether Statement One is a Statement of
Fact; the Statement was Published During a Time of Rising Skepticism Over
COVID-19 Vaccine Efficacy With the Intent of Quashing Debate on the
Vaccines. ......................................................................................................11

    B.   The Falsity Analysis Does not Require the Court to Weigh in on an
Ongoing Scientific Debate, and Concluding a Statement of This Nature is a
Protected Opinion Because it Touches on a Scientific Issue was Erroneous....18

  II.   Statement Two was Defamatory Because it Harmed Dr. Mercola................28

Conclusion .....................................................................................................33

# <u>TABLE OF AUTHORITIES</u>

**Cases:**

*Abrams v. United States*, 250 U.S. 616, 40 S.Ct. 17, 63 L.Ed. 1173 (1919) ...........27

*Arthur v. Offit*, No. 01:09–cv–1398, 2010 WL 883745 (E.D. Va. Mar. 10, 2010) 24-25

*Deeb v. Saati*, 778 Fed. Appx. 683 (11th Cir. 2019) ............................. 10, 11-13, 17

*Demby v. English*, 667 So.2d 350 (Fla. Dist. Ct. App. 1995) ..................................11

*Eiber Radiology, Inc. v. Toshiba America Medical Systems, Inc.*, 673 Fed. Appx. 925 (11th Cir. 2016) ..........................................................................................13

*Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 11 L.Ed.2d 686 (1938) ........9

*From v. Tallahassee Democrat, Inc.*, 400 So.2d 52 (Fla. Dist. Ct. App. 1981) 10-11, 13

*Hay v. Independent Newspapers, Inc.*, 450 So.2d 293, 295 (Fla. Dist. Ct. App. 1984) ........................................................................................................................9

*Horowitch v. Diamond Aircraft Industries, Inc.*, 645 F.3d 1254, 1257 (11th Cir. 2011) ........................................................................................................................9

*Horsely v. Feldt*, 304 F.3d 1125 (11th Cir. 2002)............................................. 12, 18

*Horsley v. Rivera*, 292 F.3d 695 (11th Cir. 2002) ...................................................26

*Immanuel v. Cable News Network, Inc.*, 618 F. Supp. 3d 557 (S.D. Tex 2022)......25

*Informational Control v. Genesis One Computer Corp.*, 611 F.2d 781 (9th Cir. 1980) ......................................................................................................................11

*Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098 (Fla. 2008) ................................. 9, 28

*Keller v. Miami Herald Publ'g Co.*, 778 F.2d 711 (11th Cir. 1986) .................. 9, 28

*Khashan v. State Farm Mut. Auto. Ins. Co.*, No. B290652, 2019 WL 5445199 (Cal. Ct. App. Oct. 24, 2019)................................................................................... 30-31

*Malone v. WP Company, LLC*, No. 3:22-cv-00046, 2023 WL 6447311 (W.D. Va. Sept. 9, 2023) .................................................................................................... 25-26

*McCollough v. Gannett, Co.*, No. 1:22-CV-1099, 2023 WL 3075940 (E.D. Va. Apr. 25, 2023) ............................................................................................................ 25-26

*New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) ................................................................................................................. 16, 26

*ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490 (2d Cir. 2013) ...... 21-23

*Palm Beach Newspapers, Inc. v. Early*, 334 So.2d 50 (Fla. Dist. Ct. App. 1976).....9

*Pielage v. McConnell*, 516 F.3d 1282 (1st Cir. 1992).............................................30

*Phantom Touring, Inc. v. Affiliated Publ'ns*, 953 F.2d 724 (11th Cir. 2008) ...........30

*Stembridge v. Mintz*, 652 So.2d 444 (Fla. Dist. Ct. App. 1995) .............................10

*Swanson v. Baker & McKenzie, LLP*, No. 12-c-8290, 2013 WL 1087579 (Mar. 14, 2013) ...................................................................................................... 31-32

*Texas v. Johnson,* 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989).............27

*Turner v. Wells*, 879 F.3d 1254 (11th Cir. 2018) .......................................... 5, 10-11

*Virginia v. Black*, 538 U.S. 343, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003) .............27

*Zorc v. Jordan*, 765 So.2d 768 (Fla. Dist. Ct. App. 2000) ......................................28

**Statutes:**

28 U.S.C. § 1291 ....................................................................................................1

28 U.S.C. § 1332 ....................................................................................................1

## Jurisdictional Statement

This case was initiated in the United States District Court for the Middle District of Florida under 28 U.S.C. § 1332(a): diversity jurisdiction with the amount in controversy exceeding $75,000.00. Doc. 1 – Pg. 2. Dr. Joseph Mercola (hereinafter "Dr. Mercola") is a citizen of the State of Florida, where he resides and works. Doc. 1 – Pg. 3. The New York Times (hereinafter "The Times") is a citizen of the State of New York, wherein it is incorporated and maintains its headquarters, at which it directs, controls, and coordinates its activities. Doc. 1 – Pg. 3; Doc. 79 – Pg. 3; 28 U.S.C. § 1332(a). The district court had personal jurisdiction over The Times because The Times transacts substantial business in the district; had substantial aggregate business contacts in the district; and engaged in conduct that had a direct effect on Dr. Mercola in the district (*i.e.*, distribution of the defamatory statements at issue in this case). Doc. 1 – Pp. 3-4.

The district court entered an Opinion and Order, granting The Times' Motion to Dismiss Plaintiff's Complaint under Federal Rule of Civil Procedure 12(b)(6), on February 12, 2024. Doc. 55. Dr. Mercola filed his Notice of Appeal with the United States District Court for the Middle District of Florida on March 13, 2024. Doc. 57. This Court has jurisdiction of this appeal under 28 U.S.C. § 1291.

## Statement of the Issues

1.      Whether the district court erred in concluding Statement One was a protected opinion simply because it concerns a topic of ongoing scientific debate.

2.      Whether the district court erred in finding Statement Two did not expose Dr. Mercola to hatred, ridicule, or contempt, or that it did not injure his business.

## Statement of the Case

Dr. Mercola initiated the underlying lawsuit following The Times' publication of a defamatory article about him and his practice. Dr. Mercola is a board-certified family medicine osteopathic physician who operates a wellness business with the internet website www.mercola.com. Doc. 1 – Pp. 2, 14. In February 2021, Dr. Mercola authored an online article wherein he commented on the deleterious effects of the novel mRNA ("messenger" ribonucleic acid) COVID-19 vaccines, averring the vaccines introduce a synthetic genetic sequence with the COVID-19 spike protein into the host with the objective of teaching the host body to artificially create the spike proteins. Doc. 1 – Pg. 5, Ex. A. Dr. Mercola said the novel mRNA COVID-19 vaccines "alter your genetic coding, turning you into a viral protein factory that has no off-switch." Doc. 1 – Pg. 5, Ex. A. He also publicly observed that the COVID-19 vaccines did not prevent infections, provide immunity, or stop transmission of COVID-19. Doc. 1. – Pp. 4-5.

On July 24, 2021, the Times published a digital article by Sheera Frenkel—identified as "a prize-winning technology reporter"—titled, "The Most Influential Spreader of Coronavirus Misinformation Online" (hereinafter "the Article"). Doc. 1 – Pg. 2, Ex. A. The Article opened by very matter-of-factly concluding Dr. Mercola's statements about the mRNA COVID-19 vaccines were "easily disprovable" (hereinafter "Statement One"):

> [Dr. Mercola's article] said the injections did not prevent infections, provide immunity or stop transmission of the disease.
>
> Instead, the article claimed, the shots "alter your genetic coding, turning you into a viral protein factory that has no off-switch."
>
> Its assertions are easily disprovable.

Doc. 1 – Pg. 4, Ex. A. Ms. Frenkel provided no evidence, data, or facts to support her assertion that Dr. Mercola's statements were "easily disprovable." *See* Doc. 1 – Ex. A. Indeed, the Article is devoid of any discussion of studies or scientific data on the COVID-19 vaccines. *See* Doc. 1 – Ex. A.

Prior to publication of the Article, The Times sought comment from Dr. Mercola. Doc. 1 – Pg. 6, Ex. B. Dr. Mercola responded, in part, that he is "the lead author of a peer reviewed publication regarding vitamin D and the risk of COVID-19," along with a link to the peer reviewed study, as published in the National Institute of Health's National Center for Biotechnology Information's National Library of Medicine (a publicly available library). Doc. 1 – Pp. 6-7, Ex. B. Ms.

Frenkel acknowledged receipt of Dr. Mercola's link on July 22, 2021. Doc. 1 – Pg. 7. Despite receiving the link two days prior to publication of the Article, Ms. Frenkel falsely stated in the Article (hereinafter "Statement Two"):

> [Dr. Mercola] did not address whether his coronavirus claims were factual. "I am the lead author of a peer reviewed publication regarding vitamin D and the risk of Covid-19 and I have every right to inform the public by sharing my medical research," he said. He did not identify the publication and The Times was unable to verify his claim.

Doc. 1 – Pg. 7.

On July 26, 2021, Dr. Mercola's representative emailed Ms. Frenkel identifying several inaccuracies within the Article, including her claim that Dr. Mercola's lead authorship of the study on Vitamin D and COVID-19 was unverifiable. Doc. 1 – Pg. 8. Provided in this email was a link to a tweet from Daniel Engber, a Senior Editor at *The Atlantic*, in which Mr. Engber called the Article "truly bizarre" because—as he put it—one could "literally verify the existence of this peer-reviewed publication in one second via googling[.]" Doc. 1 – Pp. 8-9. Mr. Engber's tweet included a direct link to the peer-reviewed study authored by Dr. Mercola— the same link Dr. Mercola previously provided to Ms. Frenkel. Doc. 1 – Pg. 9. Later that same day, The Times "updated" Statement Two to include a link to the study, but still maintained it was "unable to verify the claims in the study[.]" Doc. 1 – Pg. 11. This updated version of the Article did not include a formal correction. Doc. 1 – Pg. 11.

The defamatory statements published by The Times harmed Dr. Mercola's reputation and subjected him to hatred, distrust, ridicule, contempt, and disgrace. Doc. 1 – Pg. 15. For example, the Article had nearly 1,000 comments from readers, many of which were negative in nature. Doc. 1 – Pp. 16-17.

Dr. Mercola therefore initiated the underlying lawsuit against The Times in July 2023. *See generally* Doc. 1. Upon motion by The Times the district court dismissed Dr. Mercola's claims with prejudice, finding that neither of the statements were actionable. *See generally* Doc. 55. The district court summarily regarded Statement One as an opinion and, therefore, ruled it was not an actionable statement of fact. Doc. 55 – Pg. 5. The district court further determined Statement One could not give rise to a defamation claim because it required the court to pick a side in an ongoing scientific debate. Doc 55 – Pp. 5-8. As for Statement Two, the district court found it was not defamatory because it did not tend to lower Dr. Mercola's reputation in the community; expose him to hatred, ridicule, or contempt; and did not injure his business. Doc. 55 – Pg. 9. In reaching this conclusion, the district court relied on two unpublished cases wherein a similar "unable to verify" statement was the subject of the defamation suit. Doc. 55 – Pg. 9. This appeal now follows.

## Standard of Review

A grant of a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6) is reviewed *de novo*. *Turner v. Wells*, 879 F.3d 1254, 1257 (11th Cir. 2018).

## Summary of Argument

This nation was founded on the principle that public debate on issues of national concern should be free, open, robust, and uninhibited. Defamation law in this country has, in theory, been developed to ensure the continued existence of this principle. When debate is robust and uninhibited, it is impossible for a single narrative to dominate national discourse. Indeed, a debate cannot occur if there are not at least two sides engaging in the conversation.

COVID-19 largely upended that. The virus was novel—both in supposed lethality and quickness of spread—and people were afraid. This fear and the supercharged political divisions of the day allowed for a single narrative (the origin of the virus, how to slow the spread, which preventative measures to take, which therapeutic measures not to take) to control everyday life. But as time went on, many Americans began to question the narrative. They did this no more so than with the COVID-19 vaccines, which were developed in record breaking time and were largely comprised of new, never before used means of delivering a vaccine—*i.e.*, mRNA. Those inquisitive Americans looked toward medical professionals to help guide them and answer their questions. Dr. Mercola was one of those medical professionals. He authored an article that said the COVID-19 vaccines did not prevent infection, did not provide immunity, and did not prevent the spread of the disease. But Dr. Mercola's article was disseminated at a time when vaccine

administration rates were steeply declining, in large part because many Americans were now questioning the controlling narrative. In other words, a debate was beginning.

Dr. Mercola's medical opinion was counter to the prior controlling narrative. Those perpetuating the prior controlling narrative—including The Times—did not want a debate to start. They did not want countervailing facts to enter the public discourse, so they sought to silence the opposition; not through discussion of opposing facts, but by simply classifying every fact that chipped away at their narrative as "misinformation." They also sought to publicly discredit and defame those who tried to engage in the debate. Again, not through discussion of any opposing facts, but by labeling those individuals as "spreaders of misinformation." In so doing, they eradicated an opposing side. Without a second side to the debate, the debate ceased to exist. And if there was no debate, the prior controlling narrative could once again resume its status. This was the backdrop to, and the purpose for, the Article published by The Times.

Under the umbrella of being one of the most "influential spreaders of misinformation," The Times directly stated that Dr. Mercola's claims about the COVID-19 vaccines were easily disprovable and that his peer-authored study on therapeutic effects of Vitamin D on COVID-19 was unverifiable. These two statements—specifically Statement One—were nothing more than statements of

fact. The statements were not buttressed by or tied to any scientific studies, or discussion of scientific findings or conclusions. The statements, in and of themselves, were straight forward factual assertions that Dr. Mercola was wrong, and that there was not a scintilla of truth to his claims.

Determining the falsity of these statements did not require the trial court to wade into a scientific debate. It simply required the court to find whether or not there was an opposing side to the debate and whether there was a kernal of truth to Dr. Mercola's claims. The district court declined to do so; instead, it relied upon factually distinguishable and unpersuasive cases to dismiss under the scientific debate defense.

The district court's dismissal of Statement One as a protected opinion due to its scientific nature was erroneous. It was also dangerous for the state of defamation law. As mentioned, defamation law in this country has developed over the years with the purpose of preserving national debate. But in this instance, and with the various similarly situated cases (wherein the plaintiffs sued for defamatory statements made about them due to their medical opinions on COVID-19 preventative and therapeutic measures), courts are enabling the preclusion of debate. The district court's decision allowed The Times to hide behind the shield of protected opinion, despite it being inapplicable in this case; absent any decision to the contrary, The Times, and other prominent media, will only feel more emboldened to engage in similar behavior in

the future, and the sacred principle of robust and uninhibited debate will be eroded as a result.

### Argument

As a federal court sitting in diversity jurisdiction, this Court applies the substantive law of the forum state: Florida. *Horowitch v. Diamond Aircraft Industries, Inc.*, 645 F.3d 1254, 1257 (11th Cir. 2011) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817 (1938)). The elements of defamation of a public figure under Florida law are: (1) publication; (2) of a false statement of fact; (3) that is defamatory; (4) with knowledge or reckless disregard as to the falsity; and (5) that result in actual damages. *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1105-1106 (Fla. 2008); *Keller v. Miami Herald Publ'g Co.*, 778 F.2d 711, 714-15, 717 (11th Cir. 1986) (applying Florida law). The issues in this case boil down to: (1) whether Statement One is an actionable statement of fact; and (2) whether Statement Two is defamatory. Both are.

## I.    Statement One is a Statement of Fact. The "Scientific Debate" Opinion Defense is Not Applicable to This Case.

The alleged defamatory statement must be a false statement of fact, as opposed to an opinion. *Keller*, 778 F.2d at 715 (citing *Hay v. Independent Newspapers, Inc.*, 450 So.2d 293, 295 (Fla. Dist. Ct. App. 1984); *Palm Beach Newspapers, Inc. v. Early*, 334 So.2d 50, 52 (Fla. Dist. Ct. App. 1976) (per curiam), *cert. denied*, 354 So.2d 351 (1977), *cert. denied*, 439 U.S. 910, 99 S.Ct. 277 (1978)).

Whether the statement is one of fact or opinion is a question of law for the court.[1]

*Turner*, 879 F.3d at 1262-63 (citing *Keller*, 778 F.2d at 715).

While statements of "pure opinion" are inactionable, statements of "mixed opinions" are actionable. *Deeb v. Saati*, 778 Fed. Appx. 683, 687 (11th Cir. 2019); *Turner*, 879 F.3d at 1262 (11th Cir. 2018). A "pure opinion" is a "comment or opinion based on facts which are set forth in the publication or which are otherwise known or available to the reader or listener as a member of the public." *Turner*, 879 F.3d at 1262 (citing *From v. Tallahassee Democrat, Inc.*, 400 So.2d 52, 57 (Fla. Dist. Ct. App. 1981)). "Mixed expression of opinion occurs when an opinion or comment is made which is based upon facts regarding the plaintiff or his conduct that have not been stated in the publication or assumed to exist by the parties to the communication." *Id.* (citing *Stembridge v. Mintz*, 652 So.2d 444, 446 (Fla. Dist. Ct. App. 1995)). In making this distinction, the Court must determine "whether an expression of opinion is capable of bearing a defamatory meaning because it may reasonably be understood to imply the assertion of undisclosed facts that justify the expressed opinion about the plaintiff or his conduct." *Turner*, 879 F.3d at 1263.

In determining whether an alleged defamatory statement constitutes an actionable statement of fact, Florida courts "consider the totality of the

---

[1] The district court failed to undertake any analysis to determine whether Statement One was a fact, and automatically concluded it was an opinion. Doc. 55 – Pp. 5-8.

circumstances in which the statement was expressed or published, including the medium by which the statement was disseminated, the audience to which it was published, and any cautionary terms used by the publisher in qualifying the statement." *Deeb*, 778 Fed.Appx. at 688 (citing *Turner*, 879 F.3d at 1263; *Horsely*, 304 F.3d at 1131; *Demby v. English*, 667 So.2d 350, 335 (Fla. Dist. Ct. App. 1995))). This requires the Court to "consider all of the words used, not merely a particular phrase or sentence[,]" and "all of the circumstances surrounding the statement[.]" *From*, 400 So.2d at 57 (quoting *Information Control v. Genesis One Computer Corp.*, 611 F.2d 781, 784 (9th Cir. 1980)).

**A.** **Context is Key in Determining Whether Statement One is a Statement of Fact; the Statement was Published During a Time of Rising Skepticism Over COVID-19 Vaccine Efficacy with the Intent of Quashing Debate on the Vaccines.**

Statement One asserted that Dr. Mercola's medical opinions on the COVID-19 vaccines were "easily disprovable." "Disprovable" is defined as: "able to be proved false or wrong; capable of being disproved."[2] "Easily" means "without difficulty."[3]

---

[2] *Disprovable*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/disprovable (last visited Aug. 17, 2024).

[3] *Easily*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/easily (last visited Aug. 17, 2024).

Simply put, Statement One is a factual statement by The Times that Dr. Mercola's medical opinions were wrong. Statement One does not soften its assertion that Dr. Mercola's claims are "disprovable" with the use of "cautionary" language which is the hallmark of an opinion. *Deeb*, 778 Fed.Appx. at 688. To the contrary, the statement reinforces the factual nature of the "disprovable" claim by using the word "easily."

Nor can the Times argue that Statement One is mere "rhetorical hyperbole," or a "non-literal statement[] consisting of the sort of loose, figurative language that no reasonable person would believe presented facts." *Id*. at 687 (quoting *Horsely v. Feldt*, 304 F.3d 1125, 1132-33 (11th Cir. 2002) (clean version)). "Hyperbole" simply means "exaggeration."[4] No reasonable person reading the Article would assume The Times was exaggerating about the current state of Dr. Mercola's medical opinions; the most basic interpretation is that The Times was providing a factual description of the current state of the science on the COVID-19 vaccines.[5]

---

[4] *Hyperbole*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/hyperbole (last visited Aug. 17, 2024).

[5] At a minimum, it is an actionable mixed opinion, because it omits any data supporting the assertion that Dr. Mercola's claims are "easily disprovable," and this omission necessarily assumes the reader knows the supposed supporting data. Further, The Times' omission of any underlying data was purposeful; they did not want their readers to understand the science, they simply wanted to discredit Dr. Mercola.

Underscoring Statement One's existence as a fact, though, is the context in which it was written. *Id.* at 688; & *From*, 400 So.2d at 57 (courts must consider the context in which statements are made). Some of this context was not alleged in the original Complaint and, to the extent this Court is unwilling to reverse the Motion to Dismiss outright, it should remand and afford Dr. Mercola the right to file an amended complaint.[6]

Two key pieces of context are: (1) the national circumstances of the COVID-19 pandemic around the time the Article was published; and (2) the title of the Article itself. First, the Article was written during the first significant drop in COVID-19 vaccine administration[7] and the simultaneous increase in the Delta variant, which the Centers for Disease Control and Prevention ("CDC") labeled a "virus of concern" on June 15, 2021.[8] The CDC's declaration was so "significant" it prompted

---

[6] *Eiber Radiology, Inc. v. Toshiba America Medical Systems, Inc.* 673 Fed. Appx. 925, 928 (11th Cir. 2016) (favoring leave to amend over immediate dismissal under Rule 12(b)(6) which amounts to a "judgment on the merits").

[7] Daily COVID-19 vaccine doses administered, OUR WORLD IN DATA, https://ourworldindata.org/covid-vaccinations (sort by Country name on the left-hand side, select the filter "United States" and deselect the filter "World").

[8] Jen Christensen, *CDC Labels Delta Variant a "Variant of Concern." Here's What it Means.*, CNN (Jun. 15, 2021, 12:54 PM EDT), https://edition.cnn.com/us/live-news/coronavirus-pandemic-vaccine-updates-06-15-21#h_9d32f7e8f562edcc4d2e38c8c1193d8d (last visited Aug. 16, 2024); Leila Fadel, *Dr. Fauci Says the Risks From the Delta Variant Underscore the Importance of Vaccines*, NPR (Jun. 17, 2021, 9:34 AM EDT), https://www.npr.org/sections/coronavirus-live-

both Dr. Anthony Fauci and Andy Slavitt, former White House senior adviser for COVID-19 response, to encourage everyone to get vaccinated as soon as practically possible.[9]

Statement One was also published a little over one month before President Biden issued Executive Orders 14042 and 14043, requiring all federal employees and federal contractors to receive COVID-19 vaccines or face termination from employment,[10] and four months before the Occupational Safety and Health Administration required employers of 100 or more employees to implement vaccine requirements.[11]

There was also rising skepticism on the efficacy of the vaccines (as evidenced by the decline in vaccine administration and the need for the Biden Administration to mandate the vaccine); this rise in skepticism came as studies began to be released that questioned the efficacy of the vaccines. For example, a study conducted between June 17, 2021 and August 31, 2021, by the Genome Center, University of California,

---

updates/2021/06/17/1007493934/the-delta-variant-is-the-most-contagious-of-covid-19-strains (last visited Aug. 16, 2024).

[9] *Id.*

[10] Exec. Order No. 14042, 86 Fed. Reg. 50, 985 (Sept. 14, 2021); Exec. Order No. 14043, 86 Fed. Reg. 50, 989 (Sept. 14, 2021).

[11] Occupational Health and Safety Administration Emergency Temporary Standard, 86 Fed. Reg. 61,402 (Nov. 5, 2021) (to be codified at 29 C.F.R. Parts 1910, 1915, 1917, 1918, 1926, and 1928).

Davis, ultimately found that an unvaccinated individual who contracts COVID-19 and has the same Ct-values as a vaccinated person who contracts COVID-19 is no more likely to spread the virus than the vaccinated individual.[12] In fact, the CDC itself conducted a survey to determine the level of "vaccine hesitancy" for the period of May 26, 2021 – June 7, 2021.[13]

Further, President Biden announced his intentions to issue Executive Orders 14042 and 14043 on July 29, 2021—just four days after the Article was published; these Executive Orders were promoted as "new actions to get more Americans vaccinated."[14] Indeed, when he issued Executive Orders 14042 and 14043, on September 9, 2021, President Biden emphasized that while "fully vaccinated" individuals are "highly protected from severe illness even if [they] get COVID-19," and that being fully vaccinated renders these individuals "as safe as possible," the

---

[12] Charlotte B. Acharya et al, *No Significant Difference in Viral Load Between Vaccinated and Unvaccinated, Asymptomatic and Symptomatic Groups When Infected with SARS-CoV-2 Delta Variant*, medRxiv (Oct. 5, 2021), https://doi.org/10.1101/2021.09.28.21264262.

[13] CENTERS FOR DISEASE CONTROL AND PREVENTION: ESTIMATES OF VACCINE HESITANCY FOR COVID-19 (2021), https://data.cdc.gov/stories/s/Vaccine-Hesitancy-for-COVID-19/cnd2-a6zw/ (last visited Aug. 16, 2024).

[14] Fact Sheet, The White House Briefing Room, President Biden to Announce New Actions to Get More Americans Vaccinated and Slow the Spread of the Delta Variant (Jul. 29, 2021) (available at: https://www.whitehouse.gov/briefing-room/statements-releases/2021/07/29/fact-sheet-president-biden-to-announce-new-actions-to-get-more-americans-vaccinated-and-slow-the-spread-of-the-delta-variant/).

orders were being issued "to protect vaccinated workers from unvaccinated co-workers."[15]

This is the national backdrop to which the Article was published. With vaccine hesitancy higher than desired, certain media outlets took to quelling the aforementioned concerns. None, though, were as prominent as The Times, which has more than nine million subscribers worldwide. Doc. 1 – Pg. 3. The Times used its influential reach to silence any individual intent on engaging in open debate on the efficacy of the vaccines. To be clear, that is what should have been occurring: a debate. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 271, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) ("Thus we consider this case against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open[.]"). But The Times was not interested in a debate on the efficacy of the COVID-19 vaccines; it was intent on silencing any debate. The most efficient way of quelling a national debate was to paint any opposition (*i.e.*, Dr. Mercola) as uninformed and spreaders of "misinformation."

Thus, the second key piece of context is the Article's headline: "The Most Influential Spreader of Coronavirus Misinformation Online." "Misinformation" is

---

[15] Remarks by President Biden on Fighting the COVID-19 Pandemic, The White House Briefing Room (Sep. 9, 2021) (available at: https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/09/09/remarks-by-president-biden-on-fighting-the-covid-19-pandemic-3/).

defined as "incorrect" information.[16] When The Times published the Article describing Dr. Mercola as "The Most Influential Spreader of Coronavirus Misinformation Online"—wherein it affirmatively stated his claims about the vaccine not preventing infections, not providing immunity, and not stopping transmission were "easily disprovable"—it self-evidently did so with the intent of establishing a single, "factual" narrative. No debate was even possible, because the article includes no opposing facts; the only facts—as insinuated in The Article—is that COVID-19 vaccines were 100% effective in preventing infection, in immunizing an individual, and eradicating the spread of COVID-19.

Labeling Dr. Mercola a spreader of "misinformation" and saying his factual claims on the vaccine were "easily disprovable" was not "rhetorical hyperbole," or "non-literal statements consisting of the sort of loose, figurative language that no reasonable person would believe presented facts." *Deeb*, 778 Fed. Appx. at 687 (quoting *Horsely*, 304 F.3d at 1132-33 (11th Cir. 2002) (clean version)). It wholly, and without question, asserted Dr. Mercola was wrong, and that there was no possible way he could ever be right. The only right side of this non-debate was The Times, and anything it published on COVID-19 preventative measures.

---

[16] *Misinformation*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/misinformation (last visited Aug. 17, 2024).

Further underscoring the point the national debate was intended to be quashed is that the Article was devoid of any scientific studies or findings. The Article was aimed at simply "informing" readers that Dr. Mercola was wrong, without actually explaining *why* he might be wrong. The mere fact they provided no data, but summarily labeled him wrong, is what lands this claim squarely within the factual realm of defamation law.

**B.    The Falsity Analysis Does Not Require the Court to Weigh in on an Ongoing Scientific Debate, and Concluding a Statement of This Nature is a Protected Opinion Because it Touches on a Scientific Issue was Erroneous.**

Statement One makes the sweeping claim that all of Dr. Mercola's views that the COVID-19 injections did not prevent infections, provide immunity, or stop transmission of the disease are "easily disprovable." Statement One is, on its face, an objective statement which can readily be falsified.[17] The ability to falsify Statement One is demonstrated by the following information available via open-source searches.[18]

---

[17] The district court seemingly recognized this requirement in its decision: "Even if the report also conveys the message that the science is settled, this is only to state that Plaintiff is *really* wrong. Moreover, the assertion that Plaintiff is wrong is what is perhaps defamatory to him (but not actionable)—not the message that the science is settled." Doc. 55 – P. 8 (emphasis in original). The district court, however, did not undertake any analysis on how the assertion that Plaintiff is wrong was not an actionable statement.

[18] Again, if this Court is disinclined to reverse outright, it should remand with leave to amend to add the contemporaneous information derived from open sources as set forth in this brief.

First, those in significant and influential positions "hoped" the vaccines would be as effective as they were espousing, but hope is not empirically backed data. Take for instance the following exchange between Dr. Deborah Birx, the former White House Coronavirus Task Force Coordinator, and U.S. Representative Jim Jordan during the June 23, 2022, hearing held by the House Oversight and Reform Select Subcommittee on the Coronavirus Crisis:

Rep. Jordan: "Dr. Birx, can vaccinated people get COVID?"

Dr. Birx: "Yes."

Rep. Jordan: "You said in early 2021—January 2021—you knew that people who had been vaccinated could be reinfected."

Dr. Birx: "I knew that people who were naturally infected were being reinfected."

Rep. Jordan: "When the government told us—told the American people—that people who had been vaccinated couldn't get it, were they guessing, or where they lying?"

Dr. Birx: "*I don't know.* All I know is there was evidence from the global pandemic that natural reinfection was occurring, and *because the vaccine was based on natural immunity*, you cannot make the conclusion that the vaccine will do better than natural infection."

Rep Jordan: "When the government told us that the vaccinated couldn't transmit it, was that a lie, or a guess, or the same answer?"

Dr. Birx: "I think it was *hope* that the vaccine would work that way."[19] (emphasis added)

---

[19]*A Hearing with Trump White House Coronavirus Response Coordinator Dr. Deborah Birx*, *Before the H. Oversight and Reform Select Subcommittee on the Coronavirus Crisis*,

To be clear, she indicated that it was "hope" in January 2021—6 months prior to the publication of the Article—that the vaccines were as effective as was being pushed by certain elected individuals and those in the media.

Second, when the Pfizer vaccine first received its Emergency Use Authorization in December 2020, the U.S. Food and Drug Administration issued a press release in which it noted: "At this time, data are not available to make a determination about how long the vaccine will provide protection, *nor is there evidence that the vaccine prevents transmission of SARS-CoV-2 from person to person*." [20] (emphasis added). This undisputably shows that there was validity to what Dr. Mercola was saying about the vaccines.

And just because the Article was published about a highly controversial issue involving some scientific debate, does not mean the district court was robbed of subject matter jurisdiction on the issue. The district court dismissed Dr. Mercola's claims on the premise that "[s]tatements of different, even conflicting, opinions,

*H. Oversight Comm.* (Jun. 23, 2022); CSPAN. Trump Administration Response to COVID-19 Hearing [Video]. (Jun. 23, 2022) https://www.c-span.org/video/?c5021092/dr-birx-knew-natural-covid-19-reinfections-early-december-2020 at (00:27-3:54).

[20] News Release, U.S. Food and Drug Administration, FDA Takes Key Action in Fight Against COVID-19 By Issuing Emergency Use Authorization for First COVID-19 Vaccine (Dec. 11, 2020) (available at: https://www.fda.gov/news-events/press-announcements/fda-takes-key-action-fight-against-covid-19-issuing-emergency-use-authorization-first-covid-19).

about unsettled matters of scientific or medical treatment that are the subject of ongoing public debate and deep public interest, cannot give rise to defamation claims." Doc. 55 – Pp. 5-6 (citing a number of cases). These cases, however, are either factually distinguishable or are unpersuasive.

For example, the district court cited *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 497 (2d Cir. 2013): "[F]or purposes of the First Amendment and the laws relating to fair competition and defamation, [statements about contestable scientific hypotheses] are more closely akin to matters of opinion, and are so understood by the relevant scientific communities." Doc. 55 – Pg. 6. But *ONY* is factually distinguishable.

*ONY* involved rival producers of a medical product used to assist lung development of pre-maturely born infants, and the efforts of one of the co-defendant companies (Chiesi Farmaceutici, S.p.A. ("Chiesi")) in conducting scientific studies on the effectiveness of the various products currently on the market (*i.e.*, ONY's and Chiesi's products). *ONY*, 720 F.3d at 492-93. Chiesi hired Premier, Inc., a co-defendant in the lawsuit, to conduct the study. *Id.* at 493. Chiesi also hired several physicians (also named as co-defendants) to present the findings at an annual meeting of the Pediatric Academic Societies; the same physicians then published some of their findings in a peer-reviewed article in the *Journal of Perinatology*. *Id.* at 493-94. These presentations reported various scientific findings of ONY's product

being inferior to Chiesi's product, findings of fact which ONY challenged in its lawsuit. *Id.* The *ONY* district court dismissed the lawsuit on the premise that scientific findings were opinions, and not actionable facts. *Id.* at 496. On appeal, the Second Circuit agreed through the following rationale:

> Scientific academic discourse poses several problems for the fact-opinion paradigm of First Amendment jurisprudence. Most conclusions contained in a scientific journal article are, in principle, "capable of verification or refutation by means of objective proof." *Phantom Touring, Inc. v. Affiliated Publ'ns*, 953 F.2d 724, 728 (1st Cir. 1992). Indeed, it is the very premise of the scientific enterprise that it engages with empirically verifiable facts about the universe. At the same time, however, it is the essence of the scientific method that the conclusions of empirical research are tentative and subject to revision, because they represent inferences about the nature of reality based on the results of experimentation and observation. Importantly, those conclusions are presented in publications directed to the relevant scientific community, ideally in peer-reviewed academic journals that warrant that research approved for publication demonstrates at least some degree of basic scientific competence. These conclusions are then available to other scientists who may respond by attempting to replicate the described experiments, conducting their own experiments, or analyzing or refuting the soundness of the experimental design or the validity of the inferences drawn from the result. In a sufficiently novel area of research, propositions of empirical "fact" advanced in the literature may be highly controversial and subject to rigorous debate by qualified experts. Needless to say, courts are ill-equipped to undertake to referee such controversies. Instead, the trial of ideas plays out in the pages of peer-reviewed journals, and the scientific public sits as the jury.

*ONY*, 720 F.3d at 496-97.

Thus, the *ONY* court limited its reasoning and holding to "scientific academic discourse" and did not issue a sweeping ruling that any statement about science is somehow immune from tort liability. *Id.* Indeed, the Court crafted a narrow, fact specific, holding: "We therefore conclude that, to the extent a speaker or author

draws conclusions from non-fraudulent data, based on accurate descriptions of the data and methodology underlying those conclusions, on subjects about which there is legitimate ongoing scientific disagreement, those statements are not grounds for [tort claims including defamation]." *Id* at 498.

The Times Article contains ***none*** of the scientific analysis or conclusions which gave rise to the holding in *ONY*. To the contrary, the author of Statement One—who is noted as being a "technology reporter" and not a medical professional or scientist—makes the straightforward and false claim that all of Dr. Mercola's statements about the COVID vaccines are "easily disprovable" (including his statements relating to the prevention of infections, provision of immunity and/or transmission of the disease). The Article in this case was nothing more than a New York Times article, written by a non-medical journalist, aimed at the general public, with absolutely zero scientific data or studies provided in support or for discussion— not a scientific journal, written and published for other scientifically-oriented individuals to read and discuss, with a well-reasoned hypothesis, and data-backed conclusions (as was the case in *ONY*). As such, the *ONY* decision has no applicability to the present case and provides no support for the lower court's dismissal of the Complaint.

The district court also incorrectly relied on *Arthur v. Offit*, No. 01:09–cv– 1398, 2010 WL 883745 (E.D. Va. Mar. 10, 2010). Like *ONY*, *Arthur* is also

distinguishable because it included an exhaustive discussion of the science at issue, and the alleged defamatory statement itself truly was non-actionable opinion.

*Arthur* concerned an article in Wired Magazine which reviewed "in detail" the history of childhood vaccines and included an "extensive discussion of the merits of the vaccination issue" as well as several then-recent scientific studies on the matter. *Arthur*, 2010 WL 883745, at *1-*2. The 7,500-word article profiled Paul Offit, a pediatrician who devoted considerable time and effort to defending childhood vaccines. In a brief portion of the lengthy piece, Wired quoted Offit as saying "She lies" when referring to Barbara Arthur (a prominent vaccine skeptic). The *Arthur* court observed that this comment was not said literally, but, when viewed in context, "is plainly understood as an outpouring of exasperation and intellectual outrage over [Arthur's] ability to gain traction for her ideas. . . . In other words, the remark by Defendant Offit is, on its face, merely an 'imaginative expression of the contempt felt' toward his adversary . . . which can only be viewed as 'an impassioned response to the positions taken by [that adversary], and nothing more.'" *Arthur*, 2010 WL 883745, at * 5 (internal cites omitted). The *Arthur* court found the "She lies" comment to be non-actionable because: (1) it was made in the context of a fulsome and scientific discussion of childhood vaccines; and (2) the statement should not be viewed literally. *Arthur*, 2010 WL 883745, at * 5. The Article in the present case is distinguishable from *Arthur* on both grounds. The Times did not engage in a fulsome

scientific discussion of the COVID-19 vaccines, nor can Statement One be viewed as a non-literal, "imaginative expression"—it is plainly a factual assertion about Dr. Mercola's views.

Given the holding in *Arthur* is inextricably intertwined with its facts, it is concerning that *Arthur* has been relied upon by district courts dismissing a string of similarly situated cases, in which the doctor-plaintiffs sued media-defendants for alleged defamatory statements made regarding the doctor's opinion on COVID-19 preventative and therapeutic measures. *See Immanuel v. Cable News Network, Inc.*, 618 F. Supp. 3d 557, 564-65 (S.D. Tex 2022)[21]; *McCollough v. Gannett, Co.*, No. 1:22-CV-1099, 2023 WL 3075940 (E.D. Va. Apr. 25, 2023); *Malone v. WP Company, LLC*, No. 3:22-cv-00046, 2023 WL 6447311 (W.D. Va. Sept. 9, 2023). None of these cases provide any support for the dismissal of Dr. Mercola's Complaint, mostly because these recent COVID-19 cases have become self-perpetuating legal rulings, devoid of any true analysis on whether the challenged defendant-medium was really engaging in scientific debates or the alleged defamatory statements actually constituted facts as opposed to scientific conclusions

---

[21] *Appeal dismissed*, No. 22-20455, 2022 WL 18912180 (5th Cir. Sept. 27, 2022) for untimeliness only, and not on the merits.

which could be considered opinions.[22] *See Malone*, 2023 WL 6447311, at \*4-\*5 (citing and discussing both *Immanuel* and *McCullough*); Doc. 55 – Pp. 6-7 (justifying dismissal in this case based on the dismissals in *Immanuel*, *McCullough*, and *Malone*, which the district court called "strikingly similar defamation claims"). They are all factually distinguishable from *Arthur* and *ONY*, which involved fulsome discussions and analysis of scientific debates and studies. The recent COVID-19 lawsuits and the present case do not. For this reason, the scientific debate opinion defense should be found inapplicable.

As a brief policy consideration, if the district court's decision and legal reasoning is affirmed, it poses a risk of setting legal precedent that prevents robust and uninhibited debate. As mentioned above, First Amendment protections of speech "are rooted in the 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Horsley v. Rivera*, 292 F.3d 695, 701 (11th Cir. 2002) (quoting *Sullivan*, 376 U.S. at 270). This means there should be a "free trade of ideas" even if individuals find the idea disagreeable.

---

[22] It must be noted that while the *McCullough* court cautioned there is a general judicial reticence to weigh in on scientific debates, it still conducted an analysis to determine whether the challenged statements were actionable facts or protected opinions. For example, it found two statements, one in which the plaintiff's views were called "dangerous and pure quackery" and one where the plaintiff was called "pathological" (meaning the plaintiff's medical theories were "killing people") to be nothing more than hyperbolic language. *McCullough*, 2023 WL 3075940, at \*8. The district court in this case undertook no such analysis. *See* Doc. 55 – Pg. 8.

*Virginia v. Black*, 538 U.S. 343, 358, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003) (citing *Abrams v. United States,* 250 U.S. 616, 630, 40 S.Ct. 17, 63 L.Ed. 1173 (1919) (Holmes, J., dissenting); *Texas v. Johnson,* 491 U.S. 397, 414, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989)).

In the instant case, it is evident The Times published the Article to quash a national debate on the efficacy of the COVID-19 vaccines and inhibit the free trade of ideas. This is consistent with The Times' modus operandi. The Times has gained a reputation since 2016 for being one of the biggest supporters of government-backed digital censorship, with its Editorial Board averring that companies the likes of Facebook and Google permitted too much "fake news" to be spread and were too slow to block it, and asserting that digital censorship can "change the course of elections."[23] Indeed, when the New York Post reported on Hunter Biden's now infamous laptop in October 2020, The Times was one of the first large-scale media outlets to denounce it as Russian disinformation—without any evidence—only to then tacitly admit in March 2022 that the information contained on the laptop was

---

[23] Betsy McCaughey, *The NYT Finally Discovers Free Speech – After Years Calling for Big Tech Censorship*, NEW YORK POST, https://nypost.com/2022/03/21/the-nyt-finally-discovers-free-speech-after-years-calling-for-big-tech-censorship/ (Mar. 21, 2022, 7:16 p.m. ET).

true.[24] Affirmation of the district court's decision in this case could only be used to further embolden The Times to publish more "narrative-controlling" articles in the future. This will substantially erode the principle of uninhibited, robust debate.

## II. Statement Two was Defamatory Because it Harmed Dr. Mercola.

An alleged defamatory statement must be "reasonably capable of a defamatory interpretation," *Keller*, 778 F.2d at 714-15, which "tends to harm the reputation of another by lowering him or her in the estimation of the community or, more broadly stated, one that exposes a plaintiff to hatred, ridicule, or contempt or injures his business or reputation or occupation." *Jews for Jesus*, 997 So.2d at 1109. This is an objective inquiry made by the court. *See id.* ("[I]n defamation cases the interest sought to be protected is the *objective* one of reputation, either economic, political, or personal, in the outside world. In privacy cases the interest affected is the *subjective* one of injury to [the] inner person." (emphasis in original)); *Keller*, 778 F.2d at 715. "The allegedly defamatory words must be read in the context of the entire publication, and if the documents could not possibly have a defamatory effect, the complaint may be dismissed." *Zorc v. Jordan*, 765 So.2d 768, 771 (Fla. Dist. Ct. App. 2000).

---

[24] Kenneth Garger, *Hunter Biden's Infamous Laptop Confirmed in New York Times Report*, New York Post, https://nypost.com/2022/03/17/hunter-bidens-infamous-laptop-confirmed-in-new-york-times-report/ (Mar. 17, 2022, 4:28 p.m. ET).

As discussed at length in the previous section, the purpose of the Article was to discredit Dr. Mercola and his counter-controlling-narrative stance on the COVID-19 vaccines. The Article's title labeled him one of the most "influential spreaders" of "misinformation." The Article then said his claims were "easily disprovable." Finally, the author of the Article said she and The Times could not verify the claims in his peer-published study regarding Vitamin D and the risk of COVID-19. This second statement served only to further the discreditation of Dr. Mercola, and to insinuate his claims in the peer-published study (like those in his article regarding the efficacy of the vaccines) were simply wrong. In other words, this statement, in the context of the entire article, was meant to expose Dr. Mercola to "hatred, ridicule, [and] contempt," so that none of The Times' readers would believe Dr. Mercola's medical opinions.

The Article was successful in this effort. The online Article had 902 comments—with many being negative or hostile—a sampling of which Dr. Mercola included in his complaint:

> [Jul. 25, 2021] Hmmm. Let's see here we have a serial killer on the loose, responsible for tens of thousands of deaths. What does it actually take for Republicans, many of whom are dying of COVID, to exercise the blue lives and capital punishment they love? How many people does a white man actually have to kill to be prosecuted and sentenced to the ultimate punishment?

> [Jul. 25, 2021] This fool should be in prison.

[Jul. 26, 2021] Why does this snake oil salesman still have a medical license? 'Do no harm' has certainly been violated.

[Jul. 26, 2021] Oh, another 'Florida Man.' Lots of quacks down there in the swamp.
[Jul. 26, 2021] Why is such a creature allowed to post falsehoods that cause harm is beyond me. We have finally thrown the baby out with the bathwater.

[Jul. 26, 2021] Take his license.

[Jul. 26, 2021] The enduring questions is: How could a person do this and live with themselves?

Doc. 1 – Pp. 16-17. Other readers could "Recommend" (*i.e.*, "like") a comment; one of these comments received as many as 309 recommendations. Doc. 1 – Pp. 16-17. In addition to these personal attacks, Dr. Mercola also suffered professional harm by way of damage to his business. Doc. 1 – Pg. 18.

On a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court takes as true the factual allegations in the complaint and construes them in a light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008). The objective facts presented in the complaint unequivocally show that Statement Two, as read within the context of the overall article, subjected Dr. Mercola to hatred, ridicule, and contempt, and injured his business.

Where the district court erred in dismissing this claim was that she read it in isolation and failed to consider the surrounding words. Doc. 55 – Pp. 9-10. And the two "unable to verify" cases cited by the district court are both unpersuasive and factually distinguishable. First, *Khashan v. State Farm Mut. Auto. Ins. Co.* dealt with

a denial of an insurance claim for a motor vehicle accident. Because the plaintiff's insurance company (Geico) was "unable to confirm" the plaintiff had "a valid liability insurance policy" at the time of the accident, the injuring party's insurance company (State Farm) declined to pay non-economic damages under applicable state law. *Khashan v. State Farm Mut. Auto. Ins. Co.*, No. B290652, 2019 WL 5445199, at *1 (Cal. Ct. App. Oct. 24, 2019). This "unable to confirm" statement was made solely for the purpose of denying payment of certain damages, and was published only to the plaintiff's attorney (who initially submitted the monetary demand to State Farm). *Khashan*, 2019 WL 5445199, at *1. In a decision granting summary judgment for the defendants, the trial court found the letter did no more than accurately report underlying facts and what was known to be true, and that there was no evidence the plaintiff suffered negative consequences because of the alleged defamatory statement being sent to his own attorney. *Khashan*, 2019 WL 5445199, at *6-*7.

In *Swanson v. Baker & McKenzie, LLP*, the plaintiff—a former employee of Baker & McKenzie seventeen years prior—sued the law firm for defamation after she learned she was potentially denied employment by another firm because Baker & McKenzie was unable to verify her past employment. *Swanson v. Baker & McKenzie, LLP*, No. 12-c-8290, 2013 WL 1087579, at *1-*2 (Mar. 14, 2013). Specifically, Baker & McKenzie stated that they were only legally required to keep

personnel records for seven years, and they had a new record-keeping system; however, after searching a former payroll system, they were able to locate her records. *Swanson*, 2013 WL 1087579, at *2. Baker & McKenzie subsequently verified her employment to a reference company, as well as an inquiring potential employer. *Swanson*, 2013 WL 1087579, at *2. In determining whether the statement that Baker & McKenzie was initially unable to verify the plaintiff's employment was defamatory, the *Swanson* court looked at the context in which the statement was made—*i.e.*, Baker & McKenzie being asked to confirm the plaintiff's prior employment. *Swanson*, 2013 WL 1087579, at *7. In that simple context, the *Swanson* court found there was no indication the initial representations regarding Baker & McKenzie's inability to verify her employment were made to cast the plaintiff as a liar. *Swanson*, 2013 WL 1087579, at *7.

The facts in both *Khashan* and *Swanson* are completely distinguishable from those here. In this case, the "unable to verify" statement—again, within the whole context of the Article, both the written words and purpose behind it—was to discredit Dr. Mercola and his medical opinions. It was not a simple recitation of underlying facts known to be true. Indeed, others (such as Mr. Engber with *The Atlantic*) found it quite odd that The Times claimed to be unable to verify the study because the study was a publicly available document locatable via a simple internet search. Doc. 1 – Pp. 8-9. Furthermore, unlike the *Khashan*-plaintiff's inability to show negative

impact, Dr. Mercola did allege in his Complaint that the statement had both personal and professional negative impacts on him. At this stage, those facts must be accepted as true and must be construed in a light most favorable to Dr. Mercola. For these reasons, Statement Two must be found to have been defamatory.

## Conclusion

Dr. Mercola respectfully requests this Court find that Statement One is an actionable statement of fact and that Statement Two is defamatory and return this matter to the district court to proceed in litigation.

/s/ Carol A. Thompson
Carol A. Thompson
Federal Practice Group
801 17th St. N.W., Suite 250
Washington, D.C. 20006
(202) 826-4360

/s/ Eric P. Early
Eric P. Early
Jeremy Gray
Early Sullivan Wright Gizer & McRae
LLP
6420 Wilshire Blvd., 17th Floor,
Los Angeles, CA 90048
(323) 301-4660

*Counsel for Plaintiff-Appellant*

## Certificate of Compliance

I hereby certify that this Brief complies with the page and type-volume limitations of Fed. R. App. P. 32(a)(7) because this Brief contains 7,878 words, excluding the items listed in Fed. R. App. P. 32(f).

I hereby certify that this motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this Brief has been prepared in a proportionately spaced typeface using 14-point Times New Roman font.

Dated: August 26, 2024

/s/ Carol A. Thompson
Carol A. Thompson

*Counsel for Plaintiff-Appellant*